**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| NATHAN SILVA, Derivatively on Behalf of Nominal Defendant DANAHER CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>RAINER M. BLAIR, FEROZ DEWAN, LINDA H. FILLER, TERI LIST, WALTER G. LOHR, JR., JESSICA L. MEGA, MITCHELL P. RALES, STEVEN M. RALES, PARDIS C. SABETI, A. SHANE SANDERS, JOHN T. SCHWIETERS, ALAN G. SPOON, RAYMOND C. STEVENS, ELIAS A. ZERHOUNI, MATTHEW R. MCGREW, and EMANNUEL LIGNER,<br><br>Defendants,<br><br>and<br><br>DANAHER CORPORATION,<br><br>Nominal Defendant. | Case No. ______________<br><br>JURY TRIAL DEMANDED |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Nathan Silva ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Danaher Corporation ("Danaher" or the "Company"), against certain current and former executive officers and members of the Company's Board of Directors (the "Board") for breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among

other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Danaher, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought on behalf of Danaher against certain current and former officers and members of the Company's Board (collectively, the "Individual Defendants") (defined below) for, among other things, breaching their fiduciary duties to the Company and its stockholders by intentionally or recklessly making or permitting the dissemination of materially false and misleading statements and omissions between January 27, 2022, and October 23, 2023, inclusive (the "Relevant Period") regarding, among other things, the true nature of the Company's post-COVID-19 pandemic business and prospects.

2. Danaher is a global science and technology conglomerate comprised of more than twenty operating companies with positions in the biotechnology, life sciences, diagnostics, environmental and applied sectors. The Company is organized under four segments: Biotechnology; Life Sciences; Diagnostics; and Environmental & Applied Solutions.

3. Beginning in 2015, the Company completed a series of blockbuster transactions to grow its Life Sciences segment, including acquisitions of Pall Corporation ("Pall"), a manufacturer of filtration, separation, and purification tools, for nearly $14 billion in August 2015, as well as a March 2020 acquisition of General Electric Company's biopharmaceutical support business, known as GE Life Sciences, for over $21 billion, which was then renamed "Cytiva." Additionally, the Company also acquired nucleic acid and genomic product pioneer, Integrated DNA Technologies, Inc. ("IDT"), for approximately $2 billion in April 2019. The Company also

expanded its Diagnostics segment through a November 2016 acquisition of Cepheid, a molecular testing company, for approximately $4 billion.

4. Following the onset of the COVID-19 pandemic in 2020, Danaher's diagnostic tests and life sciences equipment were widely used in the effort to combat the disease. As a result, Danaher experienced explosive revenue growth during this period, and its stock price nearly tripled, reaching an all-time high of $332.43 per share on September 3, 2021.

5. However, by the beginning of 2022, it became clear that COVID-19 was beginning to enter an endemic phase, generally meaning that the numbers of infections were no longer growing exponentially, health care systems were not overwhelmed, and necessitating a shift in response. This also meant, though, that demand for Danaher's products, which propelled the Company to new heights, would likely begin to dissipate.

6. Despite publicly and repeatedly declaring that there would be enduring demand for products supporting the development of treatments for COVID-19, and that the bioprocessing business' far larger non-COVID product offerings provided a robust runway for long-term growth, Danaher's bioprocessing business was in jeopardy of falling short of its pandemic-era success. Large pharmaceutical customers, who had stockpiled inventory during the peak of the pandemic and now benefitted from increased clarity in their supply chains, found a reduced need to place new orders as they continued to work through their existing inventory. Additionally, smaller startups in early-stage development which traditionally relied on external sources no longer had the same access to funding that they did during the pandemic, and began to cut spending.

7. Throughout the Relevant Period, the Company Company and its top executives repeatedly dismissed such concerns, ignoring ongoing customer activity and market conditions which posed a significant threat to the continued growth of Danaher's bioprocessing business in

2022 and 2023.

8. Following several partial and inadequate disclosures through revisions to public forecasts over the Relevant Period, the Company finally, on October 24, 2023, revealed that it had cut its full year outlook yet again, increasing the core sales decline to a firm low double digit range and inverting modest growth in the base business to a low single digit decline. On this news, Danaher's stock price dropped nearly 5.6% over the following two days, to close at $192.65 on October 25, 2023.

9. As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct materially false and misleading statements and omissions of material fact to the investing public. Specifically, the Individual Defendants made or caused the Company to make false and misleading statements, and omitted material facts, in that: (i) revenues from products used supporting the development of vaccines and therapeutics to treat COVID-19 would materially decline as customers pursued other projects as COVID-19 entered an endemic state; (ii) customers had stockpiled inventory in the aftermath of the pandemic and were relying those items to satisfy new projects instead of placing new orders; (iii) smaller early-stage biotechnology customers no longer had the same access to external funding that they once did during the COVID-19 pandemic; (iv) contrary to the Company's representations, revenues from products and services unassociated with COVID-19 businesses were insufficient to compensate for the foregoing downturn in business in 2022 and would continue to decline in 2023; and (v) accordingly, Danaher would be unable to sustain its growth in 2022 and 2023. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

10. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

11. As a result of the foregoing, a securities fraud class action was filed against the Company, President and Chief Executive Officer ("CEO") Rainer M. Blair ("Blair"), Chief Financial Officer ("CFO") Matthew R. McGrew ("McGrew"), and Danaher's Vice President and Group Executive of Biotechnology Emmanuel Ligner ("Ligner"), captioned *Hawkins v. Danaher Corporation et al*, Case No. 1:23-cv-02055 (D.D.C. Jul. 17, 2023) (the "Securities Action"). The Securities Action has exposed the Company to massive class-wide liability.

12. In light of the Individual Defendants' misconduct—which has subjected the Company to the Securities Action, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend millions of dollars.

13. Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Danaher's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

15. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

18. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Nominal Defendant Danaher is incorporated in this District and conducts business in this District.

## PARTIES

***Plaintiff***

19. Plaintiff is and has been a continuous shareholder of Danaher common stock since May 2020.

***Nominal Defendant***

20. Nominal Defendant Danaher is incorporated under the laws of Delaware, with its principal executive offices located at 2200 Pennsylvania Avenue, N.W., Suite 800W, Washington, DC. Danaher's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "DHR."

***Individual Defendants***

21. Defendant Blair has served as the Company's CEO and as a member of the Board since September 2020. Defendant Blair also serves as a member of the Board's Science & Technology Committee, Executive Committee, and Finance Committee. As set forth in the proxy statement filed by Danaher with the SEC on March 29, 2023 ("the 2023 Proxy"), Blair received $20,196,027 in compensation from the Company in 2022. According to the 2023 Proxy, Blair beneficially owned 225,742 shares of Danaher's common stock as of March 1, 2023. Defendant Blair is named as a defendant in the Securities Action.

22. Defendant Feroz Dewan ("Dewan") has served as a member of the Board since 2022. Defendant Dewan also serves as a member of the Board's Nominating & Governance Committee, Science & Technology Committee, and Finance Committee. As set forth in the 2023 Proxy, Dewan received $224,616 in compensation from the Company in 2022. According to the 2023 Proxy, Dewan beneficially owned 1,076 shares of Danaher's common stock as of March 1, 2023.

23. Defendant Linda Filler ("Filler") has served as a member of the Board since 2005. Defendant Filler also serves as Chair of the Board's Nominating & Governance Committee and as a member of the Science & Technology Committee. As set forth in the 2023 Proxy, Filler received $368,308 in compensation from the Company in 2022. According to the 2023 Proxy, Filler beneficially owned 54,344 shares of Danaher's common stock as of March 1, 2023.

24. Defendant Teri List ("List") has served as a member of the Board since 2011. Defendant List also serves as a member of the Board's Audit Committee and Compensation Committee. As set forth in the 2023 Proxy, List received $308,308 in compensation from the Company in 2022. According to the 2023 Proxy, List beneficially owned 31,664 shares of

Danaher's common stock as of March 1, 2023.

25. Defendant Walter G. Lohr, Jr. ("Lohr") has served as a member of the Board since 1983. Defendant Lohr also serves as a member of the Board's Compensation Committee, Nominating & Governance Committee, and Finance Committee. As set forth in the 2023 Proxy, Lohr received $322,308 in compensation from the Company in 2022. According to the 2023 Proxy, Lohr beneficially owned 452,727 shares of Danaher's common stock as of March 1, 2023.

26. Defendant Jessica L. Mega ("Mega") has served as a member of the Board since 2019. Defendant Mega also serves as a member of the Board's Compensation Committee and Science & Technology Committee. As set forth in the 2023 Proxy, Mega received $308,308 in compensation from the Company in 2022. According to the 2023 Proxy, Mega beneficially owned 4,805 shares of Danaher's common stock as of March 1, 2023.

27. Defendant Mitchell P. Rales ("Mitchell Rales") is a co-founder of the Company and has served as a member of the Board since 1983. Defendant Mitchell Rales also serves as Chair of the Board's Finance Committee and Chair of the Executive Committee. According to the 2023 Proxy, Mitchell Rales beneficially owned 35,133,350 shares of Danaher's common stock as of March 1, 2023, representing 4.8% of all shares outstanding.

28. Defendant Steven M. Rales ("Steven Rales") is a co-founder of the Company and has served as a member of the Board since 1983 and as Chairman of the Board since 1984. Steven Rales previously serves as Danaher's CEO 1984 to 1990. Defendant Steven Rales also serves as a member of the Board's Science & Technology Committee, Executive Committee, and Finance Committee. According to the 2023 Proxy, Steven Rales beneficially owned 43,688,082 shares of Danaher's common stock as of March 1, 2023, representing 6.0% of all shares outstanding.

29. Defendant Pardis C. Sabeti ("Sabeti") has served as a member of the Board since 2019. Defendant Sabeti also serves as a member of the Board's Science & Technology Committee. As set forth in the 2023 Proxy, Sabeti received $308,308 in compensation from the Company in 2022. According to the 2023 Proxy, Sabeti beneficially owned 6,434 shares of Danaher's common stock as of March 1, 2023.

30. Defendant A. Shane Sanders ("Sanders") has served as a member of the Board since 2021. Defendant Sanders also serves as a member of the Board's Audit Committee and Nominating & Governance Committee. As set forth in the 2023 Proxy, Sanders received $308,308 in compensation from the Company in 2022. According to the 2023 Proxy, Sanders beneficially owned 2,890 shares of Danaher's common stock as of March 1, 2023.

31. Defendant John T. Schwieters ("Schwieters") has served as a member of the Board since 2003. Defendant Schwieters also serves as Chair of the Board's Audit Committee and as a member of the Nominating & Governance Committee. As set forth in the 2023 Proxy, Schwieters received $333,308 in compensation from the Company in 2022. According to the 2023 Proxy, Schwieters beneficially owned 57,828 shares of Danaher's common stock as of March 1, 2023.

32. Defendant Alan G. Spoon ("Spoon") has served as a member of the Board since 1999. Defendant Spoon also serves as Chair of the Board's Compensation Committee. As set forth in the 2023 Proxy, Spoon received $328,308 in compensation from the Company in 2022. According to the 2023 Proxy, Spoon beneficially owned 100,473 shares of Danaher's common stock as of March 1, 2023.

33. Defendant Raymond C. Stevens ("Stevens") has served as a member of the Board since 2017. Defendant Stevens also serves as a member of the Board's Audit Committee and Science & Technology Committee. As set forth in the 2023 Proxy, Stevens received $308,308 in

compensation from the Company in 2022. According to the 2023 Proxy, Stevens beneficially owned 16,798 shares of Danaher's common stock as of March 1, 2023.

34. Defendant Elias A. Zerhouni ("Zerhouni") has served as a member of the Board since 2017. Defendant Stevens also serves as Chair of the Board's Science & Technology Committee and as a member of the Nominating & Governance Committee. As set forth in the 2023 Proxy, Zerhouni received $328,208 in compensation from the Company in 2022. According to the 2023 Proxy, Zerhouni beneficially owned 32,477 shares of Danaher's common stock as of March 1, 2023.

35. Defendant McGrew has serves as the Company's CFO since January 2019. As set forth in the 2023 Proxy, McGrew received $7,183,344 in compensation from the Company in 2022. According to the 2023 Proxy, McGrew beneficially owned 130,230 shares of Danaher's common stock as of March 1, 2023. Defendant McGrew is named as a defendant in the Securities Action.

36. Defendant Ligner served as Vice President and Group Executive of the Biotechnology reporting segment since it was established in September 2022, and as President and CEO of Cytiva since it was acquired by Danaher in March 2020, until stepping down from his roles at the Company in October 2023. Defendant Ligner is named as a defendant in the Securities Action.

37. Defendants referenced in paragraphs 21 through 36 are herein referred to as the "Individual Defendants."

38. The Individual Defendants, together with Danaher, are herein referred to as "Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

39. By reason of their positions as officers and/or directors of Danaher, and because of their ability to control the business and corporate affairs of Danaher, the Individual Defendants owed Danaher and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Danaher in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Danaher and its shareholders so as to benefit all shareholders equally.

40. Each director and officer of the Company owes to Danaher and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

41. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Danaher, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

42. To discharge their duties, the officers and directors of Danaher were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

43. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Danaher, the absence of good faith on

their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

44. As senior executive officer and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

45. To discharge their duties, the officers and directors of Danaher were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Danaher were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Danaher's own Code of Conduct;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Danaher conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Danaher and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Danaher's operations would comply with all applicable laws and Danaher's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

46. Each of the Individual Defendants further owed to Danaher and the shareholders the duty of loyalty requiring that each favor Danaher's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position,

influence, or knowledge of the affairs of the Company to gain personal advantage.

47. At all times relevant hereto, the Individual Defendants were the agents of each other and of Danaher and were at all times acting within the course and scope of such agency.

48. Because of their advisory, executive, managerial, and directorial positions with Danaher, each of the Individual Defendants had access to adverse, non-public information about the Company.

49. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Danaher.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

52. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

53. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions

described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Danaher, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

54. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

55. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Defendants and of Danaher and at all times acted within the course and scope of such agency.

**DANAHER'S CODES OF CONDUCT**

56. Danaher maintains a Code of Conduct providing the Company's "Core Values" and "commitment to high ethical standards[.]" The Code of Conduct is intended to help the Company's employees apply the Core Values, its policies, and the law. The Code of Conduct applies to all Danaher associates and, when they are acting on behalf of Danaher, all directors of Danaher or any of its direct or indirect subsidiaries.

57. With respect to "Record Keeping and Financial Reporting," the Code of Conduct provides, in relevant part:

> Investors, government officials and others rely on our accurate and honest books and records. Accurate information is also essential within the Company so that we can make informed business decisions.
>
> Associates with finance or accounting jobs or, jobs that affect product quality, have a special responsibility in this area, but all of us contribute to the process of

> recording business results and maintaining records. Each of us has a responsibility to ensure that the information we submit in all Danaher records is complete, accurate and understandable.
>
> * * *
>
> - Associates with any role in the preparation of Danaher Corporation's financial statements and disclosures have a responsibility to ensure that they are complete and do not contain any false or misleading statements.

58. In a section titled "External Communications," the Code of Conduct states, in relevant part:

> Danaher strives to provide clear and accurate information to the media, financial analysts and the public. In addition to satisfying important legal requirements, this helps us maintain the trust of our shareholders, potential investors and government regulatory bodies. This, in turn, strengthens our corporate reputation. For these reasons, it is important that only designated associates speak publicly on behalf of Danaher.

59. The Code of Conduct closes with a "Final Word" regarding ethics and compliance at the Company, stating, in relevant part:

> The Danaher Code of Conduct is endorsed by, and has the full support of the Danaher Board of Directors. The Danaher Board of Directors is responsible for overseeing ethics and compliance at Danaher.
>
> The Ethics and Compliance team, among other responsibilities, applies and interprets the Code, manages the intake and investigation of Speak Up! questions and concerns, develops and disseminates ethics and compliance trainings and communications, and assists with the design and implementation of preventative compliance measures.
>
> The Danaher Ethics and Compliance team is managed by the Chief Ethics and Compliance Officer who reports directly to the Danaher Corporation General Counsel. The General Counsel has direct access and reporting obligations to the Board of Directors and appropriate Board committee. In administering the Code, the Ethics and Compliance team works closely with other Corporate, Platform and Operating Company functions including Legal, Human Resources, Internal Audit, Finance and other groups focused on ensuring and monitoring compliance.

60. Additionally, Danaher's Corporate Governance Guidelines were adopted to "promote the effective functioning of the Board and its committees, to promote the interests of

stockholders, and to ensure a common set of expectations as to how the Board, its various committees, individual directors and management should perform their functions."

61. With respect to the Board, the Corporate Governance Guidelines state: "The Board's responsibility is to provide direction and oversight. The Board establishes the strategic direction of the Company and oversees the performance of the Company's business and management.... In performing their duties, the primary responsibility of the directors is to exercise their business judgment in the best interests of the Company."

## DANAHER'S AUDIT COMMITTEE CHARTER

62. Danaher's Audit Committee Charter states that the purpose of the Audit Committee is to, among other things, "assist the Board in overseeing (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements[.]"

63. With respect to the Audit Committee's responsibilities concerning Financial Statements, Disclosure Matters and Controls & Procedures, the Audit Committee Charter states that that the Audit Committee shall, among other things:

1. Prior to the filing of the Annual Report on Form 10-K, meet to review and discuss with management and the independent auditor the Company's annual audited financial statements (including reviewing the Company's specific disclosures made in the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A")), the results of the independent auditor's annual audit and the report thereon and any other matter required by applicable PCAOB standards, NYSE listing standards or the Exchange Act (including the rules promulgated thereunder); and recommend to the Board whether the audited financial statements should be included in the Form 10-K.
2. Prior to the filing of the Quarterly Report on Form 10-Q, meet to review and discuss with management and the independent auditor the Company's quarterly financial statements (including reviewing the Company's specific disclosures made in the MD&A) and the results of the independent auditor's review of the quarterly financial statements.
3. Prior to the filing of the Annual Report on Form 11-K relating to the Company's savings plans, review and discuss with management and the

independent auditor the annual audited financial statements of the Company’s savings plans.

4. Review and discuss with management and the independent auditor:

   (a) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company’s selection or application of accounting principles, any major issues as to the adequacy of the Company’s internal controls and any special steps adopted in light of material control deficiencies;

   (b) analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effect of alternative GAAP methods on the financial statements;

   (c) the effect of off-balance sheet structures on the Company's financial statements; and

   (d) the effect of regulatory and accounting initiatives on the Company’s financial statements.

5. Review and discuss with the independent auditor:

   (a) the reports and other communications of the independent auditor required by law or professional auditing standards regarding (1) all critical accounting policies and practices to be used by the Company, (2) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor, and (3) other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences;

   (b) critical accounting matters to be included in the independent auditor’s report;

   (c) the matters required to be discussed by Statement on Auditing Standards No. 114 relating to the conduct of the audit, including without limitation, any difficulties encountered in the course of the work, any restriction on the scope of the independent registered public accounting firm’s activities or on access to requested information and any significant disagreements with management;

   (d) management’s annual report on, and the independent auditor’s evaluation of the effectiveness of, the Company’s internal control over financial reporting; and

   (e) assurances from the independent auditor that Section 10A(b) of the

Exchange Act, regarding the reporting of illegal acts, has not been implicated.

6. Review and discuss with management:

   (a) the process for the CEO and CFO quarterly certifications required by the Commission and the disclosures made by the CEO and/or the CFO to the Committee, if any, during the certification process regarding any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting, or any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting;

   (b) management's conclusions about the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting, and about any significant changes to the Company's internal control over financial reporting;

   (c) management's annual report on, and the independent auditor's evaluation of the effectiveness of, the Company's internal control over financial reporting; and

   (d) on an annual basis, the Company's decision to enter into swaps and other derivatives transactions that are exempt from exchange execution and clearing under "end-user exception" regulations established by the Commodity Futures Trading Commission, and periodically as appropriate review and approve the Company's policies governing the Company's use of swaps and other derivatives transactions subject to the end-user exception.

7. Discuss with management the Company's earnings press releases (including the use of nonGAAP information and any reconciliation thereof to GAAP information), as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be done generally (consisting of discussing the types of information to be disclosed and the types of presentation to be made). The chairperson may represent the entire Committee for purposes of this review.

64. With respect to Compliance Oversight Responsibilities, the Audit Committee shall:

8. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

9. Review and, if appropriate, approve waivers of the Company's Code of Conduct with respect to executive officers and directors.

10. Review with management:

(a) the policies and procedures designed to promote the Company's compliance with laws and regulations, the Company's compliance with laws and regulations and any other legal or regulatory matters that may have a material impact on the Company's financial statements;

(b) the Company's Code of Conduct, the policies and procedures designed to promote and monitor compliance with the Code of Conduct, and the results of such monitoring;

(c) any material reports or inquiries from regulators or government agencies; and

(d) the Company's risk assessment and risk management policies, including major financial risk exposures, risks relating to data privacy, cybersecurity and climate change, and the steps management has taken to monitor and mitigate such exposures and risks.

## SUBSTANTIVE ALLEGATIONS

***Background***

65. Danaher's Biotechnology business, led by Cytiva, is a global provider of technologies, services, and expertise purported to help researchers and biopharmaceutical producers advance the development, manufacturing, and delivery of various therapeutics. The Company's Diagnostics segment offers clinical instruments, reagents, consumables, software and services that hospitals, physicians' offices, reference laboratories and other critical care settings use to diagnose disease and make treatment decisions.

66. The COVID-19 pandemic increased demand for the Company's diagnostic tests and related products. For instance, in February 2020, in response to the growing COVID-19 pandemic, the United States Department of Health and Human Services ("HHS") provided the United States Food and Drug Administration ("FDA") with the power to issue emergency use authorization ("EUA") permitting the sale and use of unapproved tests for the diagnosis or detection of the virus causing COVID-19 under certain circumstances. Approximately one week

later, on February 10, 2020, the Company's IDT business released a COVID-19 primer and probe kit using DNA sequence specifications previously published by the Centers for Disease Control and Prevention ("CDC") for use in primers and probes as a product for companies interested in commercializing PCR tests pursuant to a potential FDA EUA. By the time the CDC discontinued its test kit design protocol on December 31, 2021, IDT was one of just two companies with primer and probe kits qualified under the CDC's EUA.

67. Additionally, on March 20, 2020, the FDA granted EUA for a new molecular test developed by the Company's Cepheid business to detect severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), the virus responsible for COVID-19.

68. Similarly, the COVID-19 pandemic increased demand for the Company's equipment and services used by customers to develop and produce new biotherapeutic candidates, including vaccines. Throughout 2020 and 2021, many of these bioprocessing customers were racing to develop and produce vaccines and other therapeutics to treat COVID-19 throughout the world, and the Company's Cytiva and Pall businesses experienced a surge in demand for machinery, consumables, and services related thereto.

69. By late 2021 and early 2022, however, it became increasingly clear that COVID-19 would turn endemic, essentially becoming a constant presence in the human population. One review published by researchers in March 2022 in *Science*, declared that "[i]t is inevitable that SARS-CoV-2 will become an endemic pathogen[,]" noting that the disease's "impact on our health and daily lives will change considerably over time."[1]

---

[1] Katia Koelle, et al, *The Changing Epidemiology of SARS-CoV-2*, SCIENCE, Mar. 11, 2022, at 81.

70. However, despite series challenges to Danaher's business and prospects, including stockpiled inventory at its largest customers and dwindling demand from vaccine researchers and producers, the Individual Defendants continued to dismiss or ignore such concerns and instead issue or authorize the issuance of overly optimistic and baseless financial projections, as well as faulty and improper guidance.

***Materially False and Misleading Statements***

71. At the start of the Relevant Period, on January 27, 2022, the Company issued a press release announcing its financial results for the quarter and year ended December 31, 2021. In that press release, Defendant Blair was quoted as stating: "Over the last several years, our portfolio has undergone a significant, purpose-driven transformation. We're a better, stronger company today, comprised of high-quality, market-leading franchises in attractive end-markets. ***We believe the combination of our exceptional portfolio, talented team and the Danaher Business System provides a strong foundation for 2022 and beyond***."[2]

72. The same day, Danaher hosted an earnings call with analysts and investors to discuss financial results for the quarter and full year ended December 31, 2021. With respect to the bioprocessing business in the Company's Life Sciences portfolio, Defendant Blair explained that senior management expected significant long-term demand for products used to support the production of COVID-19 vaccines:

> Biopharma continues to be our strongest-performing end market within the Life Sciences. The shifts in treatment towards biologics as the standard of care and the accelerating focus on genomic therapies are driving significant investments in research, development and production capacity across the sector. . . . Now, in addition, ***we continue [to] see significant demand related to development and production of COVID-19 vaccines and therapeutics. And we expect this activity to persist longer term. Our customers are planning for ongoing production with***

[2] All emphasis added unless otherwise indicated.

> ***the assumption that there will be an enduring need for effective treatment and prevention as the world transitions to approaching COVID-19 as an endemic virus.***

73. Blair further added that "the end of 2023, perhaps the beginning of '24, being that time frame when we call it [COVID-19] endemic with greater confidence." In response to a an analyst question if "any of the assumptions around vaccines and therapies changed" for the bioprocessing business, Defendant Blair responded "***no, our assumptions as it relates to the vaccine and therapeutics business have not changed***," and added "we're looking forward to roughly flat sales for—in the bioprocessing business for vaccine and therapeutic revenues in 2022."

74. In response to an analyst question for "clarification" on the guidance for 2022, noting that "vaccines, if I just understood you correctly, it's flattish year-on-year, which means your base Danaher ex vaccine, that's really growing at the very high end of high single[,]" Defendant Blair stated:

> So once again, just to level-set, the base business includes bioprocessing for COVID vaccines and therapeutics. It's important to note that. And, ***in fact, we see the entire base business growing both for the quarter and the full year at high single digits. And that's driven by a number of factors. One, as you just suggested, of course, the non-COVID bioprocessing business is still growing at the low double digits that we have seen here, and that continues to be strong***. We also see our non-bioprocessing business, so as you think about our diagnostic businesses, as you think about our life science instruments and so forth, we see them growing very strongly on the back of the investments that we've made around innovation, additional feet on the street and really driving the growth here.

75. Following this exchange, Cowen analyst Dan Brennan asked if there was any potential "upside" to the low double-digit growth in the non-COVID bioprocessing business over the next couple of years. Defendant Blair responded:

> ***So we do continue to talk about the low double-digit growth rate for the non-COVID bioprocessing business***. That's what we've seen for many quarters. But we also talked about the fact that our backlog continues to build there. . . . ***And so***

> ***could there be upside? Sure, there could be. . . . But for now, low double digits in the non-COVID bioprocessing business is a good planning number***.

76. Another analyst asked for further clarification on the "cadence" in bioprocessing going forward, stating "[i]t sounded like '22 is a decent proxy where maybe COVID comes down and you shake out somewhere in the mid-high single digits as a whole for that kind of $7.5 billion business." In response, Defendant Blair stated:

> No, ***I think that's right. As we look at 2022, I mentioned the COVID-related vaccine and therapeutic bioprocessing business, they'll probably be roughly flat here in 2022***. Again, the assumption being that we're starting to see the pandemic going endemic on the one hand. On the other hand, what you start seeing to happen is, if you will, we're going from 1.0 compounds to 2.0. . . . So we think that that's a good baseline to move forward with and how to think about it. ***And we've continued to view, as we've said in our long-term guide around the bioprocessing business, that that's a high single-digit grower. And I think that's the way to think about it in '22. And, as we said, we think '23 will look a lot like '22 as well***.

77. The statements detailed above in the January 27, 2022 press release and earnings call were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, and lacked a reasonable basis because they ignored ongoing customer activity and market conditions which posed a significant threat to the continued growth of Danaher's bioprocessing business in 2022, including, among other things, that: (i) revenues from products used supporting the development of vaccines and therapeutics to treat COVID-19 would materially decline as customers pursued other projects as COVID-19 entered an endemic state; (ii) contrary to Danaher's representations, revenues from products and services unassociated with COVID-19 businesses were insufficient to compensate for the downturn in business because they too were subsiding for several reasons; and (iii) accordingly, Danaher would be unable to sustain its growth in 2022.

78. On March 8, 2022, Defendants Blair and McGrew attended the 42nd Annual Cowen Healthcare Conference, during which Defendant Blair emphasized that the Company's

future growth would be fueled by the non-COVID business in bioprocessing:

> Well, first of all, let's level set on '22 and how we think about that. First of all, there, we're talking about our base business, so non-COVID testing—or, let me say it this way, COVID testing not included—growing high single digits. And that the COVID headwind represents about 200 to 300 basis points. So we're stepping down from the 60 million tests in 2021 to 50 million tests here in 2022. And that gives you a mid-single-digit [core sales] growth. And, quite frankly, we think that, that mid-single-digit growth in 2022 shows pretty well versus our peers and shows the strength of our business models and the strength of our base business. ***Now, as you unpack that, then, we see bioprocessing as a part of that base business in the high single-digit, low-double digit with strong activity levels. Yes, there's therapeutics and vaccines related to COVID. But as importantly, or if not more so, the size of the monoclonal antibody market, which continues to grow, the number of projects there going through the pipeline is 50% higher than it was just 5 years ago. Cell and gene therapy projects that are making their way through the clinic and ultimately being commercialized, there is a huge amount of leverage in that funnel. And we feel that, that really is the most important aspect here to take away***.

79. In response to a question concerning whether it was still appropriate to expect $2 billion in annual revenue for COVID vaccines and therapeutics in bioprocessing, Defendant Blair stated:

> I mean, we continue to believe that our backlog and our numbers are solid to be able to reach that and support that expectation that we put out there. And we continue to see orders coming in here for existing programs that have been very successful and new programs that are trying to address the complexities of the latest variants, whether that's from a vaccine or a therapeutic perspective. So we feel good about what that represents. But most importantly, we have seen that our non-COVID bioprocessing business is well into the low double digits in terms of growth as it has been in the last quarters. We continue to see that, that business is strong, continues to grow. And we've said that our COVID therapeutic vaccine business will be flattish year-over-year here. And I think that's still the right way to think about it so much so that we put that business into the base now and talk about bioprocessing, all in high single digits, low double digits for the year 2022.

80. Defendant Blair further emphasized that the non-COVID business would continue to sustain growth in bioprocessing for the long term:

> I don't think anybody knows what COVID does with variants in 2023 and what new vaccines and therapeutics might be in development for them. ***But what we do see is the incredible strength that we see on the monoclonal antibody, cell and***

> ***gene therapy, bi-specifics and many other types of modalities in the biologic framework, if you will. And we see those, really, as the long-term drivers of the growth. And COVID is going to do what it does, but our team is going to continue to deliver that high single digits kind of growth here for the long term***.

81. The statements detailed above made during the March 8, 2022, 42nd Annual Cowen Healthcare Conference were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, and lacked a reasonable basis because they ignored ongoing customer activity and market conditions which posed a significant threat to the continued growth of Danaher's bioprocessing business in 2022 and 2023, including, among other things, that: (i) revenues from products used supporting the development of vaccines and therapeutics to treat COVID-19 would materially decline as customers pursued other projects as COVID-19 entered an endemic state; (ii) customers had stockpiled inventory in the aftermath of the pandemic and were relying those items to satisfy new projects instead of placing new orders; (iii) smaller early-stage biotechnology customers no longer had the same access to external funding that they once did during the COVID-19 pandemic; (iv) contrary to the Company's representations, revenues from products and services unassociated with COVID-19 businesses were insufficient to compensate for the foregoing downturn in business in 2022 and would continue to decline in 2023; and (v) accordingly, Danaher would be unable to sustain its growth in 2022 and 2023.

82. On April 21, 2022, the Company hosted an earnings call with analysts and investors to discuss financial results for the first quarter ended April 1, 2022. During the call, in response to a question concerning whether customers had been "stockpiling" inventory in the Diagnostics segment or the bioprocessing business of the Life Sciences segment, Defendant Blair stated:

> Now if we switch gears briefly and go to the topic of stockpiling, ***we are very, very sensitive to this particular topic and stay extremely close with our customers***. As an example, in the first quarter, Cepheid continued to be sold out. If you think about

> bioprocessing, this is an area where there continues to be in the industry manufacturing constraints. ***So we are very, very close to our customers, working together with them, with their manufacturing schedules to ensure that we're able to not only meet their needs but also to ensure that we don't have inventory buildup in the system***. So could there be pockets of that? Perhaps on the margin, but ***generally speaking, we don't see a significant buildup in the supply chain***.

83. In response to a question about whether senior management was still "confident" that Danaher would achieve $2 billion in sales of equipment and services supporting the production of COVID-19 vaccines and therapeutics, Defendant Blair represented:

> Now if you look at our first quarter last year, our sales were up over 70%. And, so, if you look at the 2-year stack for Q1, we're in the 35% to 40% growth area, which we think is very robust and more than representative of what is going on in the market and think that that compares extremely well. In fact, we still think that we're taking share there. So that's sort of one marker that I want you to have. And then the second point is the order activity continues to be very, very strong. Last year, our orders in the first quarter were up over 90%. And, so, we anticipated that our orders in Q1 of this year would be down, but nonetheless, we continue to build backlog here in Q1 as well in the bioprocessing area. ***And this is why we're so confident in our core growth guide here for the year in bioprocessing of high single digit, low double digits between the robust growth that we're seeing and the backlog that we have, that's really important***.

84. Defendant Blair further emphasized that growth in non-COVID business would make up for any changes in COVID activity levels and continue to allow the Company to meet its annual target for bioprocessing:

> So now let's unpack that a little bit and think about what's going on and why ***COVID is sort of one variable, but that there are other variables here that are incredibly important and explain why we talk about the bioprocessing business and its growth in aggregate***. So first of all, if you think about the activity levels outside of COVID in the bioprocessing business, it's important to see what's going on in clinical trials. And I've talked about this, but you know that the project pipeline for monoclonal antibodies is 50% larger today than it was 5 years ago. For cell and gene therapy, it's 10x larger, driving extraordinary activity here in the clinical trial area. And what you see, and as I mentioned in the opening comments, you see customers really starting to focus on these new projects across all modalities and not just allocating the resources to COVID but to these new modalities. So that's really important to note that customer activity level continues to be very, very high, and that plays through in the clinical trials. Now another point to take here is monoclonal antibodies are becoming the standard of care and the

> predominant class of biologic drugs. So what's going on in monoclonal antibodies is the primary growth driver in the market and also for our business. . . . And then you add to that that emerging markets and high-growth markets such as China and India are starting to have access to these monoclonal antibody treatments. That provides additional and significant volume leverage. At the same time, you have biosimilar growth, Vijay. So these biosimilars are leveraging the fact that some of the biologic drugs, monoclonal antibodies that are higher volume are starting to come off patent, and that's increasing the penetration of those drugs throughout the world where the penetration has been lower. And that's providing another growth impetus. And then lastly, and I'll stop with this now, we've been talking a lot about single-use technology and their adoption for a while, which is an additional leverage growth vector within the bioprocessing business. So all that helps the activity that we talked about provides for volume, but SUT [single use technology] on top of that is substituting more traditional technologies and is growing even faster. And we have well over $1 billion of single-use technology. . . . ***So we feel very confident on the basis of what's going on outside of COVID. And that's why we look at it together because it's the aggregate that we look at and that really ultimately count that that will drive that high single-digit, low double-digit growth here for 2022 and also supports our high single-digit perspective beyond that***.

85. Defendant Blair also reiterated that non-COVID sales would make up changes in COVID-related sales within bioprocessing for the remainder of the year:

> ***Really, the way we're thinking about that business is, again, in aggregate, and we do believe that both the underlying strength of the markets, as I just laid out, as well as the strength of our backlog, which continues to grow, support both the high single-digit, low double-digit bioprocessing guide for the year***. And as you think about COVID within that, COVID's going to do what it does, but there is a larger market that is growing rapidly. And we're going to continue to see fluctuation as it relates to COVID volumes, whether there's a decision on booster shots for different age groups, whether it becomes part of an annualized immunization regimen. All of these are open questions. And ***our belief is that*** COVID is a part of our business, but ***there is another part of this business which is larger, it is growing at a faster rate and we are making investments to ensure that we capture the appropriate shares here. So, Dan, high single-digit, low double-digit bioprocessing growth for 2022***.

86. Later on the call, Defendant Blair again emphasized the strength of the business lines unrelated to COVID-19, stating:

> So, Luke, the way we're thinking about that is the strength of our underlying business, which I laid out here in some details, some clinical trials, mAbs, biosimilar volumes—keep in mind, it's the commercialized drugs that really drive volume here in this business—and, then, of course, that additional growth

> accelerator of the single-use technology adoption. Those are really the foundations that are driving the growth of this business. ***And the COVID business, it will do what it does, but that variation is within the realm of what we have been casting as the overall growth rate of the business. And so, you take the backlog, which continues to grow quarter-over-quarter, and you take the growth drivers that I've laid out, that is what supports the high single-digit, low double-digit growth for 2022 and the high single-digit longer-term growth guide that we've talked about***.

87. The statements detailed above made during the April 21, 2022, earnings call were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, and lacked a reasonable basis because they ignored ongoing customer activity and market conditions which posed a significant threat to the continued growth of Danaher's bioprocessing business in 2022 and 2023, including, among other things, that: (i) revenues from products used supporting the development of vaccines and therapeutics to treat COVID-19 would materially decline as customers pursued other projects as COVID-19 entered an endemic state; (ii) contrary to Danaher's representations, revenues from products and services unassociated with COVID-19 businesses were insufficient to compensate for the downturn in business because they too were subsiding for several reasons; and (iii) accordingly, Danaher would be unable to sustain its growth in 2022.

88. On May 11, 2022, Defendant Blair presented at the 2022 Bank of America Healthcare Conference. Asked to "clarify" the Company's COVID exposure in its outlook, Defendant Blair advised that the COVID business was expected to fall short of previous expectations by approximately $500 million to $600 million but emphasized the shortfall would be made up for by the non-COVID business:

> Well, first of all, let's level set on what ***the guide is for the bioprocessing business here for the full year of 2022***, which ***is high single, low double-digit growth***. . . . But what is included in that guide and what is accounted for in that guide is that the COVID vaccine and therapeutic revenue could be down by $500 million to $600 million. So that's already included in that high single-digit, double-digit total bioprocessing business. ***And the way we make that happen is that the far larger***

> ***parts of the non-COVID therapeutic and vaccine business is growing at mid-teens plus, and that is really what's driving the overall guide of high single digits, low double digits for 2022.***

89. Defendant Blair specifically attributed the updated forecast to recent developments with the Company's customers:

> ***[W]e've seen some cancellations as customers will no longer pursue a COVID project***, but in fact, they take the raw materials that they have acquired, and they apply those to the next project that they're working on. We see some delays where people say, "Look, my next project's starting up in 60 days instead of right away." ***So we see all of that, but we feel that, that would be accounted for in the $500 million to $600 million that we talked about***.

90. In response to a question concerning the upside potential for the Company's long-term outlook of mid-single digit plus core revenue growth, Defendant Blair added:

> Well, the plus really comes from the repositioning that I started off with. If you think about Danaher previously, we were a low to mid-single-digit kind of grower. I mentioned earlier the spins of Fortive, Envista and that we brought on many other companies, which I won't name again. And, then, even there, what we see is that Cytiva is growing faster than we had originally thought. We thought it was more like a 6% to 7% grower. Now we see it more firmly in the high single digits. And then, of course, molecular diagnostics used to be less than 5% of our business. Now it's over 10%. And so, what we're saying here, and we see this for the long term, we're trying to avoid rebasing our business with a different year or that sort of thing. ***We're just saying, look, this is a really robust portfolio. It is not a cyclical portfolio. It is well entrenched in attractive end markets. And we see the likelihood of being—growing faster than mid-single digits to be high***.

91. With respect to whether Danaher was worried about the biotech funding environment, Defendant Blair provided:

> ***So I don't worry much about that funding environment***. And let me, again, piece that apart a little bit. First of all, ***when you do the analysis of the biotech sector and you look at the balance sheet of the great majority of the players***, the average cash with—given ***the average burn rates is between 12 and 18 months***. Sure, there's some at 6 months, and then there's others at 18 or 24, but let's just say the average is right around 18 months. ***And we think that that's quite significant and that will continue these innovators to keep driving towards hopefully lifesaving or certainly life-improving therapeutics***. But I think when you step back for a second and you put biotech funding in relation to the bioprocess business, the most important thing to remember is that the bioprocess business is volume-driven. It is

> volume-driven. It's not the number of projects. It's the volume per project that makes a difference. And with that, that means that commercial drugs and drugs that are really in the Phase III volumes are the ones that drive this business. ***And the ones that are earlier stage, including those early-stage biotechs, have an impact but only at the margin. It is not a driver of the growth of the business. . . . But from our perspective, this is not something that will have an impact here on the business in the short term***.

92. The statements detailed above made during the May 11, 2022, Bank of America Healthcare Conference were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, and lacked a reasonable basis because they ignored ongoing customer activity and market conditions which posed a significant threat to the continued growth of Danaher's bioprocessing business in 2022 and 2023, including, among other things, that: (i) revenues from products used supporting the development of vaccines and therapeutics to treat COVID-19 would materially decline as customers pursued other projects as COVID-19 entered an endemic state; (ii) contrary to Danaher's representations, revenues from products and services unassociated with COVID-19 businesses were insufficient to compensate for the downturn in business because they too were subsiding for several reasons; and (iii) accordingly, Danaher would be unable to sustain its growth in 2022.

93. On July 21, 2022, the Company issued a press release announcing its financial results for the second quarter ended July 1, 2022. In that press release, Defendant Blair was quoted as stating: "***Danaher is comprised of high-quality franchises*** in attractive end markets with meaningful recurring revenues ***and durable business models. We believe the combination of our strong portfolio and talented team—all powered by the Danaher Business System—provides a strong foundation in today's dynamic operating environment and positions us well for the balance of 2022 and beyond.***"

94. Also on July 21, 2022, the Company hosted an earnings call with analysts and investors to discuss financial results for the second quarter. During the call, Defendant Blair represented that the Company maintained close contact with its bioprocessing customers to quell concerns about overstocking:

> In our bioprocessing business, we continue to see record activity levels from early-stage research to later-stage development and production which drove a combined core revenue growth rate of high single digits at Cytiva and Pall Biotech. Our backlog and our order levels remain very healthy, and ***as always we're working closely with customers to ensure they have the right inventory levels to support their planned activity***.

95. Defendant Blair also disclosed that Danaher now expected the bioprocessing business to earn only $1 billion in revenues for products and services related to COVID-19, but reiterated that non-COVID revenues would compensate for the miss:

> We are seeing our customers continue the healthy transition away from COVID-19 vaccines and therapies and into previously paused and new programs for other modalities. As a result, ***we now expect COVID-19 vaccine and therapeutic revenue of approximately $1 billion in 2022 down from approximately $2 billion in 2021. Now, that said, there's no change to our high single to low double-digit core revenue growth outlook in our bioprocessing business for the year as customers are accelerating their investments across all other major therapeutic modalities***.

96. Defendant Blair highlighted that activity levels in the end market for the bioprocessing business would provide a runway for very strong growth for years to come:

> The biologics market remains very healthy as evidenced by the increasing number of treatments in development and production. Today, there are over 1,500 monoclonal antibody-based therapies in development globally, which is up more than 50% from just 5 years ago. This is being driven by both novel molecules in development and the proliferation of biosimilars, which are helping to accelerate adoption in underserved markets as patents on higher-volume therapies expire. There are also over 2,000 cell and gene therapy candidates in development today, a more than tenfold increase over the last several years. ***And given this backdrop of such a significant and sustained increase in activity, we expect the growth rate in this market to remain very strong for many years to come***.

97. In response to a question concerning whether the growth rate for the bioprocessing products and services unrelated to COVID-19 were "sustainable" for 2023 and beyond, Defendant Blair stated:

> I think the way we see it is the following way. Let's level set on '22 here where, in the COVID business, we see revenues going from 2021 $2 billion to 2022 $1 billion. The non-COVID business, as you suggested, has accelerated here as customers are moving to non-COVID modalities and all sources of them, very broad-based. And, of course, on the margin, price ends up helping that as well. ***So we would expect certainly for '23 to continue to see elevated levels of non-COVID activity, probably above the low double digits that we have seen historically. Too early to say if it stays up over 20%, but certainly elevated in '23 versus what it's been historically***.

98. With respect to the Company's bioprocessing business, Defendant Blair provided:

> ***Now, as we think about our 2023 guide—which I think is what a part of your question was trying to tease out—we feel good about our mid-single-digit plus positioning there where for the long term***, which we have talked about in a number of occasions. And when you unpack that a little bit, ***we see bioprocessing to be up high single digits and that's consistent with what we've spoken of. And, as you look at bioprocessing, there, we continue to think that the non-COVID business is going to be growing very strong***. You saw what we're doing here in the second half of the year with growth rates well over 20% in non-COVID. ***And then we've also derisked the discussion here relating COVID related therapeutics and vaccines. We see $1 billion of revenue in 2022. That's down from $2 billion in '21. And we probably say $500 million for 2023***. So 2021 $2 billion, ***2022 $1 billion, and 2023 $500 million for COVID-related vaccines. And, having said all that, we still see our biotechnology business growing at high single digits***.

99. On the same call, in response to an analyst inquiry for insight on whether Danaher has seen a shift in demand from its biotech customer segment within bioprocessing, Defendant Blair stated:

> Rachel, as you just suggested, the majority of these biotechs are either preclinical or in the very early stages of clinical. And it's really important to note that our business is driven by what's happening in Phase III and ultimately commercialized drugs. Over 75% of our business is in that later stage. And so, then, as you go upstream from that, that has less of an impact. ***Now, getting specifically to your point, we really haven't seen much of an impact of the biotech funding crunch here affecting the customer activity levels that we have***. And, frankly, we do look at these biotechs and the proposals that they are pursuing whether there's proof of

> concept and data. And our sense is that the good projects and where the data is solid and convincing and proof of concept is given, they are continuing to attract funding. ***So we think that today's cash positions in the biotechs, the quality of the projects that they are pursuing, as well as the funding environment still providing funding to those that are able to provide data continues to be quite positive and is not impacting our business***. Now, of course, to your longer-term question, we just have to see that the biotech area is a cauldron of innovation. . . . So we, of course, longer term, will want to see that the funding continues to support that kind of innovation environment but today, are ***not concerned about what we see here for the next, call it, 18, 24 months***.

100. The statements detailed above made in the July 21, 2022 press release and during the earnings call the same day were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, and lacked a reasonable basis because they ignored ongoing customer activity and market conditions which posed a significant threat to the continued growth of Danaher's bioprocessing business in 2022 and 2023, including, among other things, that: (i) revenues from products used supporting the development of vaccines and therapeutics to treat COVID-19 would materially decline as customers pursued other projects as COVID-19 entered an endemic state; (ii) customers had stockpiled inventory in the aftermath of the pandemic and were relying those items to satisfy new projects instead of placing new orders; (iii) smaller early-stage biotechnology customers no longer had the same access to external funding that they once did during the COVID-19 pandemic; (iv) contrary to the Company's representations, revenues from products and services unassociated with COVID-19 businesses were insufficient to compensate for the foregoing downturn in business in 2022 and would continue to decline in 2023; and (v) accordingly, Danaher would be unable to sustain its growth in 2022 and 2023.

101. On September 15, 2022, the Company hosted a live webcast focused on bioprocessing for its annual investor and analyst meeting from Cytiva's North American headquarters in Marlborough, Massachusetts. Defendant Blair reminded listeners to the call that

the bioprocessing business boasted a high single digit long-term outlook:

> So we think that our growth rerates higher for the long term. Then you say, well, why do you think that? Well, let's have a look at the left here, where you see ***Cytiva and Pall together representing a $7.5 billion bioprocessing franchise growing high single digits for the long term***. . . .

102. Defendant Ligner, head of the Biotechnology group, offered a similar outlook for the Biotechnology segment, stating:

> Cytiva was a transformational addition to the life science platform. Pall Life Science is also very similar to Cytiva, a leader in filtration and in single-use technology with extreme talent, expert in material science, and leading around membranes and filtration technology. . . . ***We're taking those 2 outstanding companies and putting them together. We're creating an undisputed leaders in the bioprocessing***, $8.5 billion of revenue, ***anticipating long-term performance of high single digits***.

103. Later in the call, Defendant Ligner reiterated this outlook:

> Today, our bioprocessing business is $7.5 billion, of which a single-use technology is in excess of $1 billion, and we really anticipate a long-term growth rate of high single digit. Cytiva and Pall together is an incredible offering to the customer and, therefore, in an incredible position. We are so much stronger together, and this is why we are doing it.

104. Providing a summary of his presentation, Defendant Ligner added:

> I'm going just to very quickly wrap up and summarize before we move to our Q&A session. We're creating and absolutely leaders in the bioprocessing industry. Pall and Cytiva, together, it is a stronger offering for our customers. . . . So the Biotechnology group is now a leader across all modalities, including monoclonal antibody, cell and gene therapy, and mRNA. ***We have a strong secular driver in biologics***, which creates significant long-term growth opportunity and ***the long-term projection of high single digit***, uniquely positioned for the most comprehensive offering best-in-class services, support, and scale: scale of manufacturing, scale of talent, scale of commercial, scale of organic, and the ability with the Danaher Business System to continuously improve our service to customers.

105. In response to a request for more detail on the sustainability of the high single digit growth rate for the bioprocessing business, Defendant Blair added:

> First of all, it's very clear that we're coming with a tailwind that is based on COVID therapeutics as well as vaccines. And, as those wane, and we have called that out pretty clearly, right: $2 billion in 2021, ***$1 billion here in 2022, and we'd expect $500 million or so in 2023***. At the same time, ***we have the non-COVID applications growing at very fast rates, and we've talked about those being in the mid-teens plus here. And that's what we're currently seeing, and that's what our order book shows here going forward. And when we come to the high single digits, it's once again a perspective that is not tied to any single year in the dynamics of any single year, but to say, this is the kind of very positive scaled market growth that we see***.

106. The statements detailed above made during the September 15, 2022 webcast were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, and lacked a reasonable basis because they ignored ongoing customer activity and market conditions which posed a significant threat to the continued growth of Danaher's bioprocessing business in 2022 and 2023, including, among other things, that: (i) revenues from products used supporting the development of vaccines and therapeutics to treat COVID-19 would materially decline as customers pursued other projects as COVID-19 entered an endemic state; (ii) customers had stockpiled inventory in the aftermath of the pandemic and were relying those items to satisfy new projects instead of placing new orders; (iii) smaller early-stage biotechnology customers no longer had the same access to external funding that they once did during the COVID-19 pandemic; (iv) contrary to the Company's representations, revenues from products and services unassociated with COVID-19 businesses were insufficient to compensate for the foregoing downturn in business in 2022 and would continue to decline in 2023; and (v) accordingly, Danaher would be unable to sustain its growth in 2022 and 2023.

107. On October 20, 2022, the Company issued a press release announcing financial results for the third quarter ended September 30, 2022. In the release, Defendant Blair was quoted as stating: "Our growth was broad-based across all three segments, ***a testament to the durability and attractive end-market positioning of the franchises that comprise Danaher***. . . . As we look

ahead we believe the strength of our portfolio combined with our talented team and the power of the Danaher Business System ***provides a strong foundation to continue delivering meaningful shareholder value through 2022 and beyond***."

108. Also on October 20, 2022, the Company hosted an earnings call with analysts and investors to discuss third quarter 2022 results. During the call, Defendants advised that the Company expected the bioprocessing business to only generate $800 million in COVID-related sales 2022, and deliver high single digit growth for 2022. In response to an analyst question concerning any changes to the previously-reported outlook, Defendant Blair confirmed, stating:

> [A]s we think about the bioprocessing business for 2023, ***we still think that there is room for $500 million of COVID opportunity*** in order to support the needs of the population, the variance, to replenish expired sell-by dates and all the things that you can think about. But, of course, that's a number that we watch very closely. ***More importantly, we think that the non-COVID business, which, of course, will again proportionately be a much larger part of the business will continue to be very robust***. Funding levels are there, the number of modalities that continue to grow in the pipeline is broad. Our own project activity in early, mid and late stage is very strong. ***So we do not have a different view on 2023 for bioprocessing today***.

109. With respect to the impact of inventory stocking on the 2023 outlook for the bioprocessing business, Defendant Blair provided:

> We have been, as a result of the pandemic, even closer than traditionally working with our customers to understand their production plans and to ensure that they are not overstocking at the expense of others who would need the product in what was a time of constraint here for the last, call it, 18, 20 months. ***So, as a result of that, we feel as though we are well positioned to understand the inventory situation***. We do regular surveys with our customers. ***And, as a result of that, we don't believe that there is a general overstocking in the market. Having said that, we do think there are pockets where inventories are high. And those are based on customers ultimately changing their production plans, in other words, canceling orders specifically for COVID***. And, so, the large COVID players whether that be for vaccine production or whether that be for therapeutics production, they have larger inventories, and those will likely exceed 6 months of inventory. ***But I think it's important to note that those large players have many programs, and they're able to redeploy that inventory. . . . So we are confident that the strength of this market and its fundamentals remain very, very strong***.

110. In response to a question on the non-COVID order book in bioprocessing, Defendant Blair admitted:

> So, for Q3, our orders are down over 20%, as expected. And I think that's a number which bears some commentary and context. First of all, we're coming off of order comps that are well in excess of 50% in the prior year. . . . ***And I think something that is perhaps not as well-known and that bears some conversation is we and many others have meaningfully reduced our lead time. . . . And that's a pretty significant impact on the order placement cadence of our customers***. So just to mention an example here, if lead times go from 52 weeks, which has been the case in some product categories in the marketplace, to 12 weeks, customers fundamentally change their order patterns. To give you a sense of that, if a customer wanted to order over time 4 bioreactors, they would order all 4 bioreactors at once if there's a 52-week lead time. But if it's a 12-week lead time, they would order 1 bioreactor and then follow up with other orders in the future. ***So what we're seeing right now is really the normalization of the marketplace coming from a red-hot pandemic fueled time of constraint, as long lead time for orders ramped up significantly. So order rates ramped up significantly to the supply chain now normalizing and customers adjusting their order cadence. . . . So the orders were negative, to repeat, but not unexpectedly and to be seen in the context of a market that is now readjusting***.

111. The statements detailed above made in the October 20, 2022 press release and during the earnings call the same day were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, and lacked a reasonable basis because they ignored ongoing customer activity and market conditions which posed a significant threat to the continued growth of Danaher's bioprocessing business in 2022 and 2023, including, among other things, that: (i) revenues from products used supporting the development of vaccines and therapeutics to treat COVID-19 would materially decline as customers pursued other projects as COVID-19 entered an endemic state; (ii) customers had stockpiled inventory in the aftermath of the pandemic and were relying those items to satisfy new projects instead of placing new orders; (iii) smaller early-stage biotechnology customers no longer had the same access to external funding that they once did during the COVID-19 pandemic; (iv) contrary to the Company's representations, revenues from products and services unassociated with COVID-19

businesses were insufficient to compensate for the foregoing downturn in business in 2022 and would continue to decline in 2023; and (v) accordingly, Danaher would be unable to sustain its growth in 2022 and 2023.

112. On November 30, 2022, during a presentation at the Evercore HealthCONx Conference, Defendant Blair offered the following outlook for 2023: "Now as we look forward here to sort of 2023 and beyond, our portfolio and our DBS base ability to out execute is unique. ***And when you couple that with our 75% recurring revenue that's supported by attractive really low cyclical end markets, I think that speaks really well for what's to come***."

113. With respect to the bioprocessing business in 2023, in particular, Defendant Blair added:

> [A]s we think about, looking forward, the range of outcomes looks something like this. The revenue for 2023 non-COVID could be in the mid-teens. That's representative of what the 3-year CAGR has been. It's been mid- to high-teens, so it could be mid- to high-teens. It could also be what it's been sort of the last year, which is well over 25%, as you suggested in your question, certainly, that could be one outcome. Or perhaps it just settles back into the high single-digit, low double-digit longer-term growth rate that we've spoken about. ***Now I think our view is that while that's the total range, it's probably more likely that it is between the high-single digit and mid-teen range, but there is that number out there of well over 20%. But somewhere in between that range is how we see 2023 playing out***.

114. With respect to the Company's previously announced outlook for the bioprocessing business in 2023, Defendant Blair stated:

> So as we've said pretty consistently that as you look at the broader marketplace, ***we really don't see an enormous amount of stocking going on***. In fact, it wasn't until very recently that we got out of the hand-to-mouth sort of supply situation with the constraints that occurred in the supply chain through the pandemic-related demands. Now having said that, and I think I've been clear here that ***there are pockets where there has been some inventory buildup and they tend to be related to customers who had larger COVID-related programs***, whether that's a vaccine or whether that's a therapeutic, they've either not had the kind of demand drawdown that they expected because the vaccination rate is lower or the variance made a particular therapeutic no longer relevant or because they've canceled the program entirely. So you have sort of the full gamut of potential there. ***But those***

> ***are really just pockets with larger players who are quite well positioned to draw that down. And so how does that make us think about 2023? Well, we've already said, look, for 2023, we think our COVID demand goes from the $800 million I just spoke of to the $500 million, right? So you see the manifestation of what I just spoke of sort of these pockets in that change there, and that's what we're currently expecting for COVID in 2023***.

115. In response to a question concerning whether the $500 million COVID-related revenue outlook was "aggressive" or based on "visibility" in the order book for 2023, Defendant Blair provided:

> ***That's currently the status that we have with our customers, the $500 million***. And I think our customers regularly review vaccination rates, new approvals that they get around the world in various countries. ***And so that's what we think that's our expectation for '23***.

116. The statements detailed above made during the November 30, 2022 Evercore HealthCONx Conference were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, and lacked a reasonable basis because they ignored ongoing customer activity and market conditions which posed a significant threat to the continued growth of Danaher's bioprocessing business in 2022 and 2023, including, among other things, that: (i) revenues from products used supporting the development of vaccines and therapeutics to treat COVID-19 would materially decline as customers pursued other projects as COVID-19 entered an endemic state; (ii) customers had stockpiled inventory in the aftermath of the pandemic and were relying those items to satisfy new projects instead of placing new orders; (iii) smaller early-stage biotechnology customers no longer had the same access to external funding that they once did during the COVID-19 pandemic; (iv) contrary to the Company's representations, revenues from products and services unassociated with COVID-19 businesses were insufficient to compensate for the foregoing downturn in business in 2022 and would continue to decline in 2023; and (v) accordingly, Danaher would be unable to sustain its growth in

2022 and 2023.

117. On January 24, 2023, the Company issued a press release announcing financial results for the fourth quarter and year ended December 31, 2022, providing Danaher's expected sales growth in 2023.

118. Specifically, in a section titled, "Forecasted Core Sales Growth and Base Business Core Sales Growth," the press release represented:

| | % Change Year Ending December 31, 2023 vs. Comparable 2022 Period |
|---|---|
| Core sales growth (non-GAAP) | ***-Mid-single digit*** |
| Impact of COVID-19 related testing, vaccines and therapeutics | *+Low-double digit* |
| Base business core sales growth (non-GAAP) | ***+High-single digit*** |

119. The press release further added: "Starting with the first quarter 2023, the Company will revise its definition of base business core growth to exclude revenues related to COVID-19 testing, vaccines and therapeutics, in addition to the exclusion of currency translation, acquisitions and divested product lines. . . . ***For the full year 2023, the Company anticipates non-GAAP base business core revenue to be up high-single digits***."

120. Also on January 24, 2023, the Company hosted an earnings call with analysts and investors to discuss financial results for the fourth quarter and full year ended December 31, 2022. During the call, Defendant Blair discussed the outlook for the bioprocessing business in 2023, disclosing:

> Looking to 2023, we expect customers to further reduce their COVID-19-related programs. Vaccination and booster rates have been significantly lower than initially anticipated, and the availability of alternative therapeutics has reduced the need for monoclonal antibody-based treatments. ***In light of these dynamics, we now anticipate COVID-19-related vaccine and therapeutic revenue will be approximately $150 million for the full year of 2023, down from approximately $800 million in 2022 and lower than our previous expectation of $500 million***. Our non-COVID business has averaged more than 20% growth over the past 2 years. Given these elevated growth rates, we spent the past several weeks speaking

> with our customers to better understand their planning assumptions for 2023. And, based on these discussions, ***we anticipate non-COVID bioprocessing core growth will be high single digits for the full year 2023. This includes low single-digit core growth in the first quarter as customers repurpose inventory purchased for COVID-19 vaccine and therapeutic programs to non-COVID projects***.

121. With respect to 2023 guidance provided for Danaher as a whole, Defendant Blair stated:

> So with that color on what we're seeing in our business and end markets, let's now look ahead to our expectations for the first quarter and the full year. . . . ***[F]or the full year 2023, we expect high single-digit core growth in our base business. And we also expect total core revenue growth to decline mid-single digits for the year as a result of lower demand for COVID-19 testing, vaccines and therapeutics***.

122. In response to an analyst question concerning stocking dynamics, Defendant Blair provided:

> Derik, as it relates to the inventory situation, let's think about sort of our Q1 guide here as a starting point and the context for that. We expect for our overall guide to have a base business growth of mid-single digits. And we expect COVID testing, including now vaccine and therapeutics, to have high single-digit and low double-digit headwind, giving us that [core sales] decline of mid-single digits in the first quarter. Now let me come back to the base business because, of course, that's where your question resides. And, once more, we have to be clear that we have now excluded vaccine and therapeutic revenues from the base business, right? ***So our mid-single-digit base business is down from the comparable low double-digit core growth we saw in Q4 and most of 2022. And that's due mainly to bioprocessing ex COVID***. . . . Now if we look and we dig in a little bit deeper into bioprocessing, we anticipate that our non-COVID bioprocessing business will be low single digits. And that's really for two reasons. One, we're coming off of 30% growth in Q1 of 2022. ***But we're also working through the inventory pockets that we spoke about that were related primarily to COVID programs. And we do expect Q1 to be an inflection point there that we work through the majority of that in Q1 and then after that, continue to see improvement***.

123. Responding to a request for clarity on the non-COVID order book in bioprocessing, Defendant Blair admitted that orders were down by mid-teens in the fourth quarter 2022, but assured that this was a result of the market readjustment:

> Now from a current trend perspective, in the fourth quarter, our order rate improved by over 500 basis points sequentially but was still down mid-teens, ***which was as***

> ***expected as customers continued to adjust for our shorter lead times***.

124. With respect to the overall trend in bioprocessing for non-COVID sales, Defendant Blair stated:

> Now, to be clear, ***our full year 2023 guide anticipates Q1 being the low point at low single digits for the bioprocessing non-COVID core growth. And that also takes account to any inventories that might be with some of our COVID program customers, which are now being repurposed***. We're working with those customers to repurpose that inventory. ***So whatever these order dynamics, our revenue forecast for bioprocessing non-COVID in the first quarter is low single digits. We expect that to be the low point of the inventory work-off or burn-off and then move forward to what is high single-digit bioprocessing non-COVID core growth for the full year***.

125. Defendant Blair later confirmed that the Company still expected the bioprocessing business to generate high single digit sales growth as a whole in 2023:

> [W]e did talk about the bioprocessing growth range being from high single digits to mid-teens range. ***And, as I mentioned then, and I'll confirm now, we have spent the last several weeks talking to our customers to understand their planning assumptions for the year. And the clear message is the underlying demand remains robust and unchanged***. So we continue to see monoclonal antibodies, cell therapy and gene therapy activity continue to be strong. And we're even seeing more work on mRNA on the back of its success with COVID vaccines. So while the demand is remaining solid, customers are actually not anticipating a step-up in activity. So activity remains strong and, as we've seen in prior quarters, but they're not anticipating a step-up versus what we've seen here in the last couple of years. ***And, so, as you look at the 2, 3, even 4-year stacks here, we've seen mid-teens growth CAGRs [compound annual growth rate] for bioprocessing non-COVID. So, coming back then, if you take our high single-digit bioprocessing non-COVID full year guide on the back of an approximately 30% comp from 2022, it fits right in the mid-teens range, both on a 2- and a 3-year basis***.

126. Defendant Blair also reiterated that the Company had confidence that the second half of 2023 would make up for the sales lag in the first half of the year for bioprocessing:

> So as we think about burning off these inventories, you asked about the confidence in the later part of the year. And ***that confidence is based on our discussions with customers, the backlog that we have, the continued order activity that we see and that has improved over prior periods. And, so, we feel very good about the high single digits non-COVID bioprocessing growth for 2023***.

127. Defendant Blair concluded the call by assuring that, "[f]or 2023, we see our base business growing at high single digits" across Danaher as a whole.

128. The statements detailed above made in the January 24, 2023, press release and during the earnings call the same day were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, and lacked a reasonable basis because they ignored ongoing customer activity and market conditions which posed a significant threat to the continued growth of Danaher's bioprocessing business in 2023, including, among other things, that: (i) revenues from products used supporting the development of vaccines and therapeutics to treat COVID-19 would materially decline as customers pursued other projects as COVID-19 entered an endemic state; (ii) customers had stockpiled inventory in the aftermath of the pandemic and were relying those items to satisfy new projects instead of placing new orders; (iii) smaller early-stage biotechnology customers no longer had the same access to external funding that they once did during the COVID-19 pandemic; (iv) contrary to the Company's representations, revenues from products and services unassociated with COVID-19 businesses would sharply decline in 2023; and (v) accordingly, Danaher would be unable to sustain its growth in 2023.

129. On April 25, 2023, the Company issued a press release announcing financial results for the first quarter ended March 31, 2023, revising its sales growth outlook for 2023. Specifically, the press release provided:

| | % Change Year Ending December 31, 2023 vs. Comparable 2022 Period |
|---|---|
| Core sales (decline) growth (non-GAAP) | ***-High-single digit*** |
| Impact of COVID-19 related testing, vaccines and therapeutics | *+Low-double digit* |
| Base business core sales growth (non-GAAP) | ***+Mid-single digit*** |

130. The press release further stated: "For the second quarter and full year 2023, the Company anticipates that non-GAAP ***base business core revenue will be up mid-single digits year-over-year.***"

131. Also on April 25, 2023, the Company hosted an earnings call with analysts and investors to discuss financial results for the first quarter ended March 31, 2023. On the call, Defendant Blair explained that Danaher was lowering its outlook for the bioprocessing business based on recent conversations with customers:

> Reported revenue in our Biotechnology segment declined 16% and core revenue was down 13%. In bioprocessing, base business core revenue growth was in line with our expectations of low single digits in the first quarter. . . . ***[D]emand at our large customers, who were primarily responsible for therapies in commercial production and later-stage clinical trials, remains robust and they're steadily working through inventory they built during the pandemic. Based on our most recent customer conversations, we now expect the inventory normalization process to continue through the second half of the year. During the quarter, we also saw softer demand globally at many of our emerging biotech customers as more pronounced pressures on liquidity and funding accelerated their efforts to conserve capital leading to project delays and cancellations. In consideration of these factors, we anticipate second quarter and full year base business core growth in bioprocessing will be largely consistent with the first quarter***.

132. Notwithstanding the difficulties in bioprocessing, Defendant Blair represented:

> Now turning to the full year 2023. ***Despite the near-term and temporary challenges within bioprocessing, we anticipate mid-single digit core growth in our base business. We also expect total core revenue to decline high single digits for the year as a result of lower demand for COVID-19 testing, vaccines and therapeutics***.

133. In response to a question for greater clarity on bioprocessing performance in China during the quarter and the trend moving forward, Defendant Blair indicated that the market would recover in the second half of the year:

> Well, as it relates to bioprocessing in China, we've had a very good and strong business there in China for years. And helped quite significantly in China in order to build the capacity for vaccines and for other biologics. And what we see today, much like we've seen in the U.S., is that the emerging biotech segment, which is

> an important part of China's efforts to build a local biopharma industry, is also impacted by capital constraints. So we've seen that play out in China as well. And, in fact, that's what is the primary impact on our China numbers here. . . . ***Now, as it relates to the full year in China, we expect our full year in China to be up low single digits for Danaher overall based on the market recovery, exiting COVID as well as, if you will, a normalization of the activity level in bioprocessing***.

134. The statements detailed above made in the April 25, 2023, press release and during the earnings call the same day were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, and lacked a reasonable basis because they ignored ongoing customer activity and market conditions which posed a significant threat to the continued growth of Danaher's bioprocessing business in 2023, including, among other things, that: (i) revenues from products used supporting the development of vaccines and therapeutics to treat COVID-19 would materially decline as customers pursued other projects as COVID-19 entered an endemic state; (ii) customers had stockpiled inventory in the aftermath of the pandemic and were relying those items to satisfy new projects instead of placing new orders; (iii) smaller early-stage biotechnology customers no longer had the same access to external funding that they once did during the COVID-19 pandemic; (iv) contrary to the Company's representations, revenues from products and services unassociated with COVID-19 businesses would sharply decline in 2023; and (v) accordingly, Danaher would be unable to sustain its growth in 2023.

135. On May 10, 2023, at the 2023 Bank of America Healthcare Conference, Defendant Blair reaffirmed the Company's recent guidance adjustment in response to a question for the Company's "latest guide" on bioprocessing:

> So going forward, for the rest of the year, ***we really are expecting the same type of activity level as we saw in Q1***. And that's what we're seeing in the bioprocessing business. We continue to see that. We were 1% in the first quarter, so call it flat, and that's essentially what we're saying for the remainder of the year, expecting no change in that dynamic as the market works through these various points.

136. The statement detailed above made during the May 10, 2023 Bank of America Healthcare Conference was materially false and misleading when made, or omitted to state material facts necessary to make the statement not misleading, and lacked a reasonable basis because it ignored ongoing customer activity and market conditions which posed a significant threat to the continued growth of Danaher's bioprocessing business in 2023, including, among other things, that: (i) revenues from products used supporting the development of vaccines and therapeutics to treat COVID-19 would materially decline as customers pursued other projects as COVID-19 entered an endemic state; (ii) customers had stockpiled inventory in the aftermath of the pandemic and were relying those items to satisfy new projects instead of placing new orders; (iii) smaller early-stage biotechnology customers no longer had the same access to external funding that they once did during the COVID-19 pandemic; (iv) contrary to the Company's representations, revenues from products and services unassociated with COVID-19 businesses would sharply decline in 2023; and (v) accordingly, Danaher would be unable to sustain its growth in 2023.

137. On July 25, 2023, the Company issued a press release announcing financial results for the second quarter ended June 30, 2023, again revising its sales growth outlook for 2023. Specifically, the press release provided:

| | % Change Year Ending December 31, 2023 vs. Comparable 2022 Period |
|---|---|
| Core sales (Decline) growth (non-GAAP) | ***-High-single digit to low-double digit*** |
| Impact of COVID-19 related testing, vaccines and therapeutics | *+Low-double digit* |
| Base business core sales growth (decline) (non-GAAP) | ***+Low-single digit*** |

138. The press release further added: "For the full year 2023, the Company anticipates that non-GAAP base business core revenue growth will be up low-single digits year-over-year."

139. Also on July 25, 2023, the Company hosted an earnings call with analysts and investors to discuss financial results for the second quarter ended June 30, 2023. Defendant Blair reiterated the new guidance, stating:

> Now turning to the full year 2023. ***Due to near-term challenges within bioprocessing, we now anticipate low-single digit core revenue growth in our base business. We also expect total core revenue to decline high single to low double digits for the year as a result of lower demand for COVID-19 testing, vaccines, and therapeutics***.

140. Defendant Blair assured investors that the Company was working with large pharmaceutical customers to destock their inventory levels:

> So let's start with orders. In the first half of the year, our orders were essentially down 20%. And as we look forward here to the second half of the year, we think that our orders will be down modestly. That's a combination of various factors. One being that our large customers, CDMOs, continue to work through inventories. . . . ***And, then, we are actively managing inventories down. While that is not new, we've intensified our efforts there really in order to get as much as possible of the stocking topic behind us here in 2023***.

141. Defendant McGrew similarly provided assurance in response to a question asking him to quantify the amount of destocking, stating:

> I mean, I could probably come up with some numbers, but it would be imprecise. . . . I mean we don't really spend a lot of time trying to figure out how much was destocking as much as spending time with the customers in a pretty proactive way these days to understand what's on hand, what's the real need that you've got site by site by site so that we can help them manage down to an inventory level they are comfortable with. . . . So I don't know that I've got a great answer for a number, ***but we are actively managing it in probably a way that was more active than we have been***.

142. On the same call, Defendant Blair added:

> We talked about the various puts and takes of the destocking that I think you correctly summarized with pharma and emerging biotech. You see the China piece that we're flagging here. And, then, of course, actively managing those inventories with our customers here in order to get as much as possible behind us in 2023. ***And we think 2023 probably is the bottom***.

143. The statements detailed above made in the July 25, 2023, press release and during the earnings call the same day were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, and lacked a reasonable basis because they ignored ongoing customer activity and market conditions which posed a significant threat to the continued growth of Danaher's bioprocessing business in 2023, including, among other things, that: (i) revenues from products used supporting the development of vaccines and therapeutics to treat COVID-19 would materially decline as customers pursued other projects as COVID-19 entered an endemic state; (ii) customers had stockpiled inventory in the aftermath of the pandemic and were relying those items to satisfy new projects instead of placing new orders; (iii) smaller early-stage biotechnology customers no longer had the same access to external funding that they once did during the COVID-19 pandemic; (iv) contrary to the Company's representations, revenues from products and services unassociated with COVID-19 businesses would sharply decline in 2023; and (v) accordingly, Danaher would be unable to sustain its growth in 2023.

***The Truth Emerges***

144. The truth emerged gradually throughout the Relevant Period through a series of partial disclosures. On May 11, 2022, following the Company's earnings call held on April 21, 2022, Defendant Blair revealed for the first time that annual revenue in Danaher's bioprocessing business for products and services supporting the production of COVID-19 vaccines and therapeutics was expected to be $1.4 billion to $1.5 billion in 2022, down from previous estimates of $2 billion. Despite this partial correction, the Company continued to mislead investors by assuring that the miss would be made up for by growth in the non-COVID arm of the bioprocessing business. Specifically, Defendant Blair stated: "And the way we make that happen is that ***the far***

***larger parts of the non-COVID therapeutic and vaccine business is growing at mid-teens plus, and that is really what's driving the overall guide of high single digits, low double digits for 2022***."

145. On July 21, 2022, Defendant Blair admitted that Danaher expected the bioprocessing business to earn only $1 billion for COVID-related vaccines and therapeutics in 2022, but continued to mislead investors by emphasizing that "***there's no change to our high single to low double-digit core revenue growth outlook in our bioprocessing business*** for the year [2022] as customers are accelerating their investments across all other major therapeutic modalities."

146. On October 20, 2022, Defendant Blair advised that the Company expected the bioprocessing business to only generate $800 million in COVID-related sales 2022, and deliver high single digit growth for 2022, down from the high single digit to low double digit growth previously communicated.

147. On this news, the Company's stock price fell nearly 6%, to close at $243.08 on October 20, 2022.

148. On January 24, 2023, the Company announced that it expected core sales to *decline* mid-single digits in 2023, as a result of "lower demand for COVID-19 testing, vaccines and therapeutics." The Company also announced that it only expected to grow base business core sales by high single digits in 2023. The Company continued to mislead investors, however, by downplaying the extent of the demand slump.

149. On this news, the Company's stock price fell 5.2% over the next two days, closing at $262.95 on January 25, 2023.

150. On April 25, 2023, Defendants Blair and McGrew admitted that there was a slowdown in the base bioprocessing business, and that the Company now expected its base business core sales to only grow by mid-single digits in 2023, down from high single digits.

151. On this news, Danaher's stock price fell over 9%, from $254.35 at of the close of trading on April 24, 2023 to $231.99 at the close of trading on April 25, 2023.

152. On July 25, 2023, the Company again revised its annual outlook, cutting base business core sales growth from mid-single digits to low-single digits, resulting in a core sales decline of high single digits to low double-digits, up from a decline of high-single digits. Defendant Blair revealed that the cut to Danaher's base business core sales guidance was attributable to "near-term challenges within bioprocessing," including, in particular, "the funding environment and the stocking situation in China." Defendant Blair further admitted that the Company needed "a more frequent touch point pattern . . . with our customers in order to ensure that we keep our finger on the pulse of what's going on there."

153. On October 24, 2023, the Company revealed that it had cut its full year outlook yet again, increasing the core sales decline to a firm low double digit range and inverting modest growth in the base business to a low single digit decline. Defendant Blair confirmed that "customers are still working through inventory built up during the pandemic[.]" Defendant Blair later added: "And bioprocessing was as expected, and we don't believe that changes here either. So, we do believe that we're at the bottom here in 2023 in bioprocessing."

154. On this news, Danaher's stock price dropped nearly 5.6% over the following two days, to close at $192.65 on October 25, 2023.

***Harm to the Company***

155. As a direct and proximate result of the Individual Defendants' misconduct, Danaher has lost and expended, and will lose and expend, millions of dollars.

156. Such expenditures include, but are not limited to, legal fees associated with the Securities Action filed against the Company, its President and CEO, CFO, and Vice President and Group Executive of Biotechnology, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

157. Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

158. Such losses also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

159. As a direct and proximate result of the Individual Defendants' conduct, Danaher has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

160. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

161. Danaher is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

162. Plaintiff is an owner of Danaher common stock and has been a continuous shareholder of Company stock at all relevant times.

163. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

164. A pre-suit demand on the Board of Danaher is futile and, therefore, excused. At the time this action was commenced, the fourteen-member Board consisted of Individual Defendants Blair, Dewan, Filler, List, Lohr, Mega, Mitchell Rales, Steven Rales, Sabeti, Sanders, Schwieters, Spoon, Stevens, and Zerhouni (the "Director Defendants"). As set forth below, all fourteen Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

165. The acts complained of herein constitute violations of fiduciary duties owed by Danaher's officers and directors, and these acts are incapable of ratification.

166. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

167. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs

complained of herein and are therefore not disinterested parties.

168. Each of the Director Defendants authorized and/or permitted false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

169. Additionally, the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

170. Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

171. Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

172. Defendants List, Sanders, Schwieters, and Stevens (the "Audit Defendants") serve on the Company's Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the

issuance of material misstatements and omissions regarding the Company's business, finances, and operations as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

173. The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

174. Furthermore, during the Relevant Period, Director Defendants Blair sold substantial amounts of his personally held Danaher stock while in the possession of material non-public information. Specifically, during the Relevant Period, Defendant Blair sold 42,137 shares of Danaher stock, for proceeds of $12.2 million. In doing so, Defendant Blair has exposed himself to criminal liability and heightened civil liability and damages. These insider sales, occurring during the Relevant Period, create a further likelihood of additional significant liability, thus making Defendant Blair neither disinterested nor independent.

## COUNT I

### Against The Individual Defendants For Violations of § 10(b) of the Exchange Act and Rule 10b-5

175. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

176. The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

177. The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

178. The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

179. The Individual Defendants acted with scienter because they (i) knew that the public documents and statements issued or disseminated in the name of Danaher were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

180. The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Danaher, their control over, and/or receipt and/or modification of Danaher's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Danaher, participated in the fraudulent

scheme alleged herein.

181. As a result of the foregoing, the market price of Danaher common stock was artificially inflated. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of Danaher common stock in purchasing Danaher common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

182. In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

**COUNT II**

**Against The Individual Defendants**
**For Breach Of Fiduciary Duty**

183. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

184. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, candor, loyalty, and due care.

185. The Individual Defendants willfully ignored the obvious deficiencies in the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

186. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their

fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

187. Specifically, the Individual Defendants made or caused the Company to make false and misleading statements, omitted material facts, and lacked a reasonable basis because they ignored ongoing customer activity and market conditions which posed a significant threat to the continued growth of Danaher's bioprocessing business in 2022 and 2023, including, among other things, that: (i) revenues from products used supporting the development of vaccines and therapeutics to treat COVID-19 would materially decline as customers pursued other projects as COVID-19 entered an endemic state; (ii) customers had stockpiled inventory in the aftermath of the pandemic and were relying those items to satisfy new projects instead of placing new orders; (iii) smaller early-stage biotechnology customers no longer had the same access to external funding that they once did during the COVID-19 pandemic; (iv) contrary to the Company's representations, revenues from products and services unassociated with COVID-19 businesses would sharply decline in 2022 and 2023; and (v) accordingly, Danaher would be unable to sustain its growth in 2022 and 2023.

188. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

189. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

190. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

191. Plaintiff, on behalf of Danaher, has no adequate remedy at law.

## COUNT III

### Against Defendant Blair for Breach of Fiduciary Duty (*Brophy*)

192. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

193. As Danaher's President, CEO, and Board member, Defendant Blair owed fiduciary duties of loyalty and good faith to the Company. Despite this, Defendant Blair sold 42,137 shares of his personally held Company stock for proceeds of $12.2 million during the Relevant Period while in possession of material non-public information.

194. Defendant Blair made these stock sales while in possession of inside information concerning ongoing customer activity and market conditions which posed a significant threat to the continued growth of Danaher's bioprocessing business in 2022 and 2023.

195. Defendant Blair knew this was information the market would consider material and that it was virtually certain to harm the Company's stock price and made these sales before

disclosing this material information to the public.

196. By selling his stock while in possession of adverse, material non-public information, Defendant Blair exploited his position, breached his fiduciary duties, and violated the the Company's Codes of Conduct. Because Defendant Blair sold his stock before the non-public information in his possession could be publicly disclosed and harm the Company's stock price, Defendant Blair improperly benefited from this breach of fiduciary duty and the Company is entitled to damages and the imposition of a constructive trust on any profits obtained thereby.

197. Plaintiff, on behalf of Danaher, has no adequate remedy at law.

**COUNT IV**

**Against The Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty**

198. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

199. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

200. Plaintiff on behalf of Danaher has no adequate remedy at law.

**COUNT V**

**Against The Individual Defendants for Unjust Enrichment**

201. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

202. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Danaher.

203. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Danaher that was tied to the performance or artificially inflated valuation of Danaher or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

204. Plaintiff, as a shareholder and a representative of Danaher, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

205. Plaintiff, on behalf of Danaher, has no adequate remedy at law.

**COUNT VI**

**Against The Individual Defendants For Waste Of Corporate Assets**

206. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

207. The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of the Company's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

208. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying and collecting excessive compensation and bonuses; and

(b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Action.

209. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

210. Plaintiff, on behalf Danaher, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Danaher and that Plaintiff is a proper and adequate representative of the Company;

B. Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C. Directing Danaher to take all necessary actions to reform and improve its corporate governance and internal procedures to protect Danaher and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;
- strengthening the Company's internal reporting and financial disclosure controls;
- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and
- strengthening the Company's internal operational control functions;

C. Awarding punitive damages;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: January 24, 2024

**RIGRODSKY LAW, P.A.**

By: */s/ Seth D. Rigrodsky*

Seth D. Rigrodsky (#3147)
Gina M. Serra (#5387)
Herbert W. Mondros (#3308)
300 Delaware Avenue, Suite 210
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: sdr@rl-legal.com
Email: gms@rl-legal.com
Email: hwm@rl-legal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**GRABAR LAW OFFICE**
Joshua H. Grabar, Esq.
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085